(SPACE BELOW FOR FILING STAMP ONLY)

LAW OFFICES OF
**SEAN M. BURKE**
A PROFESSIONAL CORPORATION
202 NEWPORT CENTER DRIVE, 2ND FLOOR
NEWPORT BEACH, CALIFORNIA 92660-7530
(949) 644-3434
Sean M. Burke, Esq., Bar #: 097460
sean@seanmburke.com

IN ASSOCIATION WITH:
Jeanne Anne Steffin, Esq., State Bar # 49437
626 North Garfield Avenue, Suite A
Alhambra, California 91801-1448
(626) 793-6969
jsteffin@steffin.com

**Attorneys for:**   Plaintiff, Rickie John Grate, by and through his Guardian ad Litem, Sandra Tucker

## DISTRICT COURT OF THE STATE OF CALIFORNIA

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICKIE JOHN GRATE, BY AND THROUGH HIS GUARDIANS AD LITEM, SANDRA TUCKER AND MARSHA D. LATNER, ) | Case #:         C 04-05220 MEJ ARB |
| ) | |
| ) Plaintiff, | File Date:   12/9/2004 |
| ) | Judge:       Honorable Maria-Elena James |
| v. ) | **PETITION FOR APPROVAL OF SETTLEMENT ON BEHALF OF INCOMPETENT PERSON; STIPULATION OF PARTIES; [PROPOSED] ORDER** |
| UNITED STATES OF AMERICA, and Does 1 through 100, inclusive, ) | |
| ) Defendants. | |

[Filed concurrently with Stipulation for Settlement]

I, Sandra Grate, hereby declare as follows:

1.      I am the duly appointed guardian ad litem of Rickie Grate and am the sister of Rickie Grate. I have personal knowledge of the following facts and, if called upon to testify, I could and would testify competently thereto.

2.      I submit this declaration in support of the Petition for Approval of Compromise of the Claim of Rickie Grate, who is incompetent.

3.      When this case was initiated, my sister, Marsha Latner, was appointed co-guardian ad litem; since the case was initiated, my sister has passed away.

1

4.     Rickie Grate lives with my husband and me at 4560 Enchanted Way, Redding, California 96001. His date of birth is July 8, 1947 and his social security number is 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.

5.     In addition to being Mr. Grate's guardian ad litem in this matter, I am also his duly appointed Conservator. Exhibit 1 is the order appointing me as Mr. Grate's conservator.

6.     I am not a plaintiff in this case, however, my husband, Jay Tucker, and I will be the recipient of certain funds from Mr. Grate's settlement and from the future funds to be paid to him, inasmuch as he has been living in our house since April 2002 and we intend to take care of him in the future. Since April 2002, he has been the recipient of Section 1151 benefits from the Veteran's Administration and we have charged him room and board and compensated my husband for his time in caring for Mr. Grate. We are his caregivers on an around-the-clock basis. All the expenditures are approved by the Probate Court, pursuant to a Conservatorship established for Mr. Grate.

7.     Mr. Grate's claim arose October 26, 2001, during vascular surgery at the VAMC - San Francisco (Fort Miley). We allege the anesthesiologists involved in Mr. Grate's care were negligent in the medical care and treatment they provided to him and that, as a result, Mr. Grate suffered a severe and debilitating brain injury, which has left him unable to work, and unable to care for himself or to independently take care of his activities of daily living.

8.     As a result of his brain injuries, Mr. Grate needs assistance with getting dressed, toileting, eating, and virtually every other activity. He is unable to drive, unable to manage his own financial affairs, and unable to take care of himself. He needs someone to be with him and to watch him otherwise he wanders off into the streets and he does not know how to get home. Although he underwent extensive rehabilitation training and therapy at the VA Palo Alto, he was found to be not trainable or rehabilitatable and my husband and I have been caring for him ever since then.

9.     Attached as Exhibit 2 is a true and correct copy of a report from Deborah Doherty, M.D., a rehabilitation specialist, summarizing Mr. Grate's condition and his

2

LAW OFFICES OF
SEAN M. BURKE
A PROFESSIONAL CORPORATION
(949) 644-3434

1  disabilities.

2       10.    Mr. Grate has been represented in this case by Sean M. Burke, 202 Newport

3  Center Drive, 2nd floor, Newport Beach, California, 92660, 949-644-3434,

4  sean@seanmburke.com in association with Jeanne Steffin, Esq. The attorneys did not

5  become involved in this case at the instance of the party against whom the case is asserted.

6  The attorneys have not requested or received or are expected to receive attorney's fees other

7  than as set forth below.

8       11.    By way of settlement, the defendant United States of America has offered to

9  pay a present value of $1,000,000, as follows: [1]

10           A.    A lump sum of $672,310.00 to Rickie Grate, by and through his

11 guardian ad litem and conservator, Sandra Tucker, and to his attorneys, Sean M. Burke and

12 Jeanne Steffin.

13           B.    The United States of America shall purchase a structured settlement

14 annuity which will pay $5,000 per month, level payments, for the life of Rickie Grate,

15 guaranteed for four (4) years. If Mr. Grate passes away within the guarantee period of 4

16 years, the remaining guaranteed periodic payments shall revert to the United States of

17 America, in checks made payable to the United States Treasury.

18      12.    From the $672,310.00 lump sum payment set forth in paragraph 11.A.,

19 Petitioner requests attorneys fees and costs to be paid to Sean M. Burke and Jennie Steffin,

20 as follows:

21           A.    Attorney fees pursuant to 28 U.S.C. § 2678 (25%)      $250,000.00

22           B.    Attorney costs                                        $39,507.73

23      The balance of the lump sum portion of the settlement, to wit, $382,802.27, shall be

24 paid to the Conservator of Rickie Grate, to be deposited in the Conservatorship account.

25      13.    There is a Conservatorship of the Estate of Rickie Grate filed in the County of

26

27

28  [1]Further details regarding the Settlement are contained in the Stipulation and Proposed Order
For Compromise Settlement and Release, filed concurrently with this document.

PETITION FOR APPROVAL OF SETTLEMENT ON BEHALF OF INCOMPETENT PERSON; STIPULATION OF PARTIES[Filed concurrently with
Stipulation for Settlement]

LAW OFFICES OF
SEAN M. BURKE
A PROFESSIONAL CORPORATION
(949) 644-3434

1   Shasta, State of California, Case Number 23149. Any expenditures from the Rickie Grate

2   Conservatorship shall continue to be subject to review by the Probate Court in the County of

3   Shasta, State of California.

4       14.    There are no MediCal liens, Medicare liens or any other liens on this recovery

5   to the best knowledge of Petitioner.

6       15.    Petitioner has made a careful and diligent inquiry and investigation to

7   ascertain the facts relating to the incident or accident in which Mr. Grate was injured; the

8   responsibility for the incident or accident; and the nature, extent, and seriousness of the

9   claimant's injuries. Petitioner fully understands that if the compromise proposed in this

10  petition is approved by the court and is consummated, Mr. Grate will be forever barred from

11  seeking any further recovery of compensation even though his injuries may in the future

12  appear to be more serious than they are now thought to be.

13      16.    Petitioner recommends the compromise settlement and the proposed

14  disposition of the proceeds of the settlement to the court as being fair, reasonable, and in the

15  best interest of Mr. Grate and requests that the court approve this compromise settlement and

16  proposed disposition and make such other and further orders as may be just and reasonable.

17      17.    Number of pages attached: 21.

18      I declare under penalty of perjury and under the laws of the State of California that

19  the foregoing is true and correct and that this declaration was executed on

20  _11/29/06_____, 2006 in Redding, California.

21

22                                      Sandra Tucker
                                        Sandra Tucker
23

24  Approved as to Form and Content:

25

26  Dated: 11/28/06_____          Sean M. Burke
27                                  Sean M. Burke
                                    Attorney for Rickie Grate, by and through
28                                  his Guardian ad Litem, Sandra Tucker

LAW OFFICES OF
SEAN M. BURKE
A PROFESSIONAL CORPORATION
(949) 644-3434

1

## STIPULATION OF PARTIES

2

3        1.        The parties hereto, by and through their attorneys of record, hereby stipulate

4    and jointly request that the Court approve the **Petition for Approval of Settlement on**

5    **Behalf of an Incompetent Person** and the disbursements and allocations described therein.

6    The parties further stipulate and request that the Court approve the Petition without a

7    hearing, or in the alternative by telephonic hearing, within 30 days in order to facilitate the

8    implementation of the settlement terms.

9

10

11        Dated:  _11-28-06_

12                                                    Sean M. Burke
                                                      Attorney for Plaintiff, Rickie Grate, by and
13                                                    through his guardian ad litem, Sandra
                                                      Tucker

14

15                                                    KEVIN V. RYAN
                                                      United States Attorney
16

17        Dated: _11/30/06_

18                                                    JONATHAN U. LEE
                                                      Assistant United States Attorney
19                                                    Attorneys for Defendant

20

21

22

23

24

25

26

27

28

PETITION FOR APPROVAL OF SETTLEMENT ON BEHALF OF INCOMPETENT PERSON; STIPULATION OF PARTIES; [PROPOSED] ORDER
[Filed concurrently with Stipulation for Settlement]

LAW OFFICES OF
**SEAN M. BURKE**
A PROFESSIONAL CORPORATION
(949) 644-3434

<u>**ORDER**</u>

Having considered the Petition of Sandra Tucker, Guardian Ad Litem and Conservator of Rickie Grate, and the Stipulation of Parties, and,

Good Cause appearing therefore,

IT IS HEREBY ORDERED, that the settlement entered into between Rickie Grate, by and through his Guardian ad Litem, Sandra Tucker, is hereby approved and that the following payments are approved and authorized:

1.    The defendant United States of America shall pay a present value of $1,000,000, as follows:

    A.    A lump sum of $672,310.00 to Rickie Grate, by and through his guardian ad litem and conservator, Sandra Tucker, and to his attorneys, Sean M. Burke and Jeanne Steffin.

    B.    The balance of $327,690 shall be used to purchase a structured settlement from New York Life Insurance Company, which will pay to the Conservator of Rickie Grate the sum of $5,000 per month, level payments, for the life of Rickie Grate, guaranteed for four (4) years. If Mr. Grate passes away before the end of the four year guarantee period, the payments shall revert to the United States and shall be payable to the United States Treasury.

2.    From the $672,310.00 lump sum payment set forth in paragraph 1.A., attorneys fees and costs shall be paid to Sean M. Burke and Jeanne Steffin, as follows:

    A.    Attorney fees pursuant to 28 U.S.C. § 2678 (25%)    $250,000.00

    B.    Attorney costs    $39,507.73

The balance of the lump sum portion of the settlement, to wit, $382,802.27, shall be paid to the Conservator of Rickie Grate, for deposit into the Conservatorship account, expenditures from which shall remain subject to review by the Shasta County Probate Court.

Dated: December 4, 2006

Hon. Maria Elena James
United States District Judge

IT IS SO ORDERED

Judge Maria-Elena James

PETITION FOR APPROVAL OF SETTLEMENT ON BEHALF OF INCOMPETENT PERSON... currently with
Stipulation for Settlement]

# DEBORAH L. DOHERTY, M.D.

Physical Medicine & Rehabilitation

## REHABILITATION MEDICINE EVALUATION REPORT

| | |
|---|---|
| PATIENT: | GRATE, RICKIE |
| DATE OF INJURY: | 10/26/01 |
| DATE OF BIRTH: | 07/08/47 |
| DATE OF EVALUATION: | 10/07/05 |
| DATE OF REPORT: | 10/31/05 |

## IDENTIFICATION

Rickie Grate is a 58-year-old, right-handed gentleman who suffered a hypoxic ischemic brain injury secondary to a postoperative cardiorespiratory arrest on 10/26/01.

## PURPOSE OF EVALUATION

I was asked by Attorney Sean Burke to review the patient's medical records, to meet and evaluate the patient and to interview the patient's sister Sandra Tucker and her husband, with whom the patient lives. The purpose of this evaluation was to allow me to form an opinion as to the nature and extent of the patient's current residual deficits, future lifetime needs and probable life expectancy.

## HISTORY OF PRESENT ILLNESS

The history of the present illness was obtained from interviews of the patient's sister, Sandra Tucker, and brother-in-law Jay Tucker and from a review of the medical records of the Veterans Administration Hospital at Fort Miley in San Francisco, the Veterans Administration Hospital in Palo Alto and the Veterans Administration Clinic in Redding, California. The patient was unable to give a medical history.

Mr. Grate is a 58-year-old, right-handed gentleman with a history of hyperlipidemia, hypertension and coronary artery disease status post coronary artery bypass graft surgery in 1999, who was admitted to the Veterans Administration Hospital at Fort Miley in San Francisco on 10/25/01 for elective aortobifemoral bypass graft surgery for symptomatic peripheral vascular disease. A preoperative angiogram had demonstrated severe disease of the left common iliac artery and moderate disease on the right. His symptoms included thigh and buttock claudication occurring after

1125 Sir Francis Drake Boulevard, Kentfield, California 94904 · (415) 485-3509 · Fax (415) 485-3507

walking about 200 yards.

On 10/26/01, the patient was taken to the operating room for aortobifemoral bypass graft surgery with a prosthetic graft. He required an endarterectomy of the right femoral artery. At the conclusion of surgery, Mr. Grate was extubated in the operating room and subsequently suffered a loss of his airway. His blood pressure dropped from a systolic of 105 down to 67. An oral airway was placed, mask ventilation started and CPR was initiated. The first attempt at tracheal intubation was unsuccessful. The second attempt at intubation was successful.

Per the Code Blue record (Page 00001559), CPR was initiated at 1630. The patient was noted to be bradycardic at 1642, but no blood pressure or pulse was recorded. At 1650, a pulse of 71 and blood pressure of 126/63 were recorded.

Per the note of anesthesiologist Joseph Rapp, the patient was "hypotensive for a total of 12 to 15 minutes and was receiving CPR during this time."

A CT brain scan on 10/30/01 appeared normal except for mildly prominent ventricles and sulci for age, low attenuation foci in the right putamen as well as right posterior limb of the internal capsule, suggesting old lacunar infarct and pansinus and mastoid air cell disease.

The patient remained nonresponsive following his cardiorespiratory arrest. A transesophageal probe was placed demonstrating normal left ventricular wall motion.

He was seen by neurology on 10/31/01. That consultation note indicates that it had been difficult to establish an airway during the resuscitation attempts on 10/26/01, and "he was reintubated, but ET tube was placed in the esophagus." An examination off Propofol and other sedatives for 48 hours revealed that the patient opened his eyes spontaneously and to voice but did not visually track, did not blink to threat, offered no verbal response and did not follow commands. He did have intact oculovestibular responses and corneal reflexes and gag reflex. The patient withdrew his right leg to pain and had minimal withdrawal vs. a triple flexion response to pain with the left leg. The neurologist reviewed the brain scan of 10/30/01 and indicated there was questionable loss of grey/white differentiation in the right insula. The neurologist's impression was hypoxic brain injury with some suggestion of left hemiparesis. He felt it was difficult to give a prognosis for a number of reasons, including the fact that the patient had just been extubated. An EEG performed around this time was abnormal with generalized slowing without epileptiform or abnormal focal features.

An MRI of the brain with and without Gadolinium was performed on

2

11/06/05 and revealed a T2 prolongation in the periventricular white matter. There was no evidence of ischemia. Pansinusitis with mastoid air cell opacification was noted bilaterally.

Neurology examination 11/06/01 revealed a Glasgow Coma Score of 3. Reportedly neurology had assessed the patient with Propofol shut off for about 15 minutes.

The patient did require reintubation and was placed back on a ventilator on 11/06/01.

The patient did have some periodic agitation requiring intermittent boluses of Fentanyl and Propofol to prevent self-extubation. The patient's sedation was ultimately transitioned to Haldol.

The patient was weaned from the ventilator on 11/10/01.

By approximately 11/15/01, the patient began to track and inconsistently follow commands.

He was treated for pneumonia during this hospitalization.

Endocrinology was consulted to assist in management of the patient's high blood sugars.

The patient's hospital course was also notable for dehiscence of his midline abdominal surgical wound which was treated with wet-to-dry dressing changes. The left groin wound also dehisced and purulent material was expressed from the site.

The patient was treated with Fluconazole for a PICC line infection which had grown out Torulopsis glabrata.

On 11/20/01, a feeding gastrostomy tube was placed.

An occupational therapy evaluation dated 11/28/01 noted that the patient was having difficulty following simple one-step commands. He was able to move his extremities inconsistently upon command. He was dysarthric.

Two weeks prior to his 12/04/01 transfer to the Veterans Administration Hospital in Palo Alto for rehabilitation, the patient began making significant neurologic improvement including verbalization and more consistent command following. During his hospitalization, his blood pressure medications did require adjustment and good control was ultimately achieved.

His midline abdominal wound and left groin wound demonstrated healthy granulation tissue at the time of his 12/04/01 discharge.

On 12/04/01, the patient was transferred to the rehabilitation unit at the Veterans Administration Hospital in Palo Alto. On

3

admission, he was not oriented to place or time. He was able to follow one-step commands 60 to 70% of the time. His abdominal and groin wounds were healing by secondary intention. Mr. Grate required assistance for all aspects of basic self-care and mobility. The patient's course at the Palo Alto VA inpatient rehab unit was notable for a gradual improvement in his neurologic status. He was treated for an enterococcal urinary tract infection on 01/08/02. He had some problems with low serum sodium.

The patient's blood pressure medications were adjusted and he was weaned from Nifedipine.

His diabetes medication was also adjusted.

The patient failed to show any significant cognitive change with a trial of Ritalin.

To assist in normalization of sleep/wake cycles, he was placed on Trazodone at bedtime and Zoloft in the morning.

By discharge, his abdominal and groin wounds were healing. He was still primarily fed via gastrostomy tube.

The occupational therapy discharge summary for the Palo Alto VA rehab unit indicated that Mr. Grate's performance in answering simple yes/no personal information questions improved to a 50-85% accuracy level range. He was able to focus on a task for an average of one to two minutes. He remained disoriented to place and time by discharge. His swallow remained impaired.

Physical therapy discharge summary from the Palo Alto VA Hospital indicated that the patient was at a moderate to minimal assistance level for rolling in bed using a bed rail. His wheelchair to bed transfers were at a minimal assist level. He was able to propel a wheelchair with maximal cuing and minimal physical assistance. He was able to ambulate with a front wheeled walker with moderate physical assistance and verbal cues. The patient's physical therapist reported that he had significantly impaired initiation and responded best to tactile cues and simple, one to two-word commands. He was noted to be severely apraxic with impaired motor planning.

A Confidential Competency Report was prepared by neuropsychologist Harriet Katz Zeiner Ph.D. on 01/07/02. Mr. Grate was felt to be functioning at too low a level to be formally assessed. He was not oriented to day, date, month, year, place or the reason for his hospital admission. His yes/no responses were not entirely reliable. He had poor short-term memory and was found to be highly distractible. His attention span did not exceed two to three minutes. It was felt that he needed 24-hour-per-day supervision and that he should be conserved.

4

On 01/14/02, Mr. Grate was discharged to Sunbridge Nursing Home in Redding, California.

A telephone call was received on 02/07/02 by the patient's VA Palo Alto occupational therapist from his sister, Marsha Latner, inquiring about the status of his wheelchair cushion. A Jay Extreme Wheelchair Cushion had been ordered as well as an incontinence cushion cover. It had, unfortunately, still not arrived, and the patient's sister indicated that Mr. Grate had a sore on his buttocks. The occupational therapist made phone calls to the physical therapy and nursing staff taking care of Mr. Grate at the nursing home, and she was informed that he did not have a pressure sore but rather had an infected pimple. Because the patient had improved in terms of his mobility status, his treating physical therapist at the nursing home felt that a foam cushion in the wheelchair would be adequate.

In a social work note from April 2002, it was noted that Mr. Grate had improved mobility but no safety awareness, and Sunbridge Skilled Nursing Facility was concerned about his possible elopement from the facility and being in harm's way since Sunbridge was located on a corner near a busy street. Mr. Grate's sister, Sandra Tucker, took the patient home from Sunbridge Skilled Nursing Facility in April 2002. Mrs. Tucker reported that Mr. Grate had been "escaping" from Sunbridge Skilled Nursing Facility and this is part of what prompted her to bring him home to live with her.

Mr. Grate continues to reside with his sister, Sandra Tucker, and her husband in their home in Redding, California.

## PAST MEDICAL HISTORY

1. Coronary artery disease, status post myocardial infarct February 1999. An echo on 02/12/99 revealed overall preserved left ventricular contractile function with an ejection fraction of 50-55%.

2. Hyperlipidemia.

3. Hypertension.

4. History of sebaceous cyst.

5. Tobacco dependence.

6. Peripheral vascular disease.

7. Dyspepsia.

8. Left subclavian artery plaque without significant stenosis.

5

**PAST SURGICAL HISTORY**

1. Three-vessel coronary artery bypass graft surgery February 1999.

2. Aortobifemoral bypass graft surgery 10/26/01.

**FAMILY HISTORY**

The patient's two brothers reportedly had cardiac bypass surgery in their 50s. One of the patient's two sisters is disabled as a result of a stroke. The patient's mother died at age 72 secondary to leukemia. The patient's father died at age 67 from a myocardial infarct.

**SOCIAL HISTORY**

Prior to the patient's hypoxic brain injury, he was living independently with his significant other in a motor home in Arcata, California. He is a high-school graduate who received average grades in school, per his sister, Sandra Tucker. Sometime following his graduation from high school, he joined the U.S. Army and saw combat in Vietnam. His special training was in artillery "big guns." He was honorably discharged from the military.

Prior to the patient's anoxic brain injury, he was self-employed as the sole owner of a "rental yard and Ryder truck rental" company. This business had been in his family for over 25 years. Originally, the family business was started by his father and mother. Subsequently, the patient and his brother and sister-in-law worked for the family business. In approximately 1990, the patient became sole proprietor of the rental yard. His brother had previously left the business in about 1980. At the time of his injury, the patient did not have any employees, though his sister reported that he occasionally hired friends to help him out. The patient's job required that he be able to repair all of the equipment that he rented out, which included not only Ryder trucks, but also caterpillars, bulldozers, dump trucks, Kabota tractors, forklifts, industrial air compressors and other small pieces of equipment. The patient reportedly had a Class I driver's license and was able to operate all of the equipment he rented.

Prior to his brain injury, his hobbies included traveling in his motor home and taking his boat out on the ocean and on lakes. He enjoyed these activities with his significant other and with his family. He also enjoyed using his computer, fishing and camping.

The patient reportedly drank socially prior to his injury. His current intake of alcohol is rare, occurring about two to three

6

times per year. His medical records indicate that as of 1999, he had a 30 pack year smoking history. He smoked up until the time of his surgery in October 2001 and later resumed cigarette smoking. He currently smokes six to seven cigarettes per day.

Currently the patient's two sisters, Marsha Latner and Sandra Tucker, are his conservators.

## CURRENT MEDICAL CARE

The patient reportedly treats with Elaine Herney, M.D. at the Veterans Administration Hospital in Redding, California.

## REHABILITATION THERAPY

1.  PHYSICAL THERAPY:  The patient last received formal physical therapy when he was a resident at Sunbridge Skilled Nursing Facility. He was discharged from Sunbridge in April of 2002.

2.  OCCUPATIONAL THERAPY:  The patient last had occupational therapy through the Veterans Administration Outpatient Clinic in Redding about one to two years ago.

3.  SPEECH THERAPY:  Speech therapy services have not been provided since the patient was discharged from Sunbridge Skilled Nursing Facility in April of 2002.

4.  DAY TREATMENT PROGRAM:  The patient participated for a period of time at the Senior Citizens Golden Umbrella Day Program in Redding, but reportedly his participation was poor. He may have received physical therapy through this program. He subsequently attended the Quest Activity Center but did not participate in that program's activities either.

## A TYPICAL DAY

The patient requires 24-hour-per-day supervision. He does sleep through the night on most nights. He goes to bed between 8:30 p.m. and 10:00 p.m. after watching T.V. with his sister and brother-in-law. His brother-in-law wakes him up between 11:00 a.m. and 12:00 noon. He is reportedly difficult to arouse. The patient's sister and brother report that it takes at least 30 minutes to coax him out of bed. He reportedly does not like taking orders to get up and he often becomes agitated. His brother-in-law, Jay Tucker, makes breakfast for him. After breakfast, the patient will sit on the porch and watch the activity in the street or he will watch television. He accompanies family members when they go out on errands or outings. He then has dinner with his family, watches television and goes to bed.

7

## REVIEW OF SYSTEMS

**HEENT:** The patient's sister reports that Mr. Grate has an altered sense of smell and taste which developed after his brain injury. The patient is unaware of this. He wears reading glasses and did so prior to his brain injury.

**CARDIORESPIRATORY:** Mr. Grate does not complain of chest pain, shortness of breath or palpitations.

**GI:** Per the patient's sister, he does not complain of nausea or stomach upset. He is incontinent of bowel and has between one and two incontinent bowel movements per day.

**GU:** The patient denies urgency, frequency and dysuria. He denies incontinence. His sister, however, reports that he does have occasional bladder accidents. He wears a diaper to bed at night but does not wear a diaper during the day. As a result, his clothes need to be changed at least once a day, four or five days a week. In addition, his diaper routinely needs to be changed in the morning when he wakes up.

**MUSCULOSKELETAL:** The patient denies any spine, joint or extremity pain and his sister confirms that he does not complain of pain.

**NEUROLOGIC:** The patient's sister and brother-in-law report that he has difficulty walking, coordination problems, balance problems and cognitive difficulties. These developed following his brain injury of October 2001. When the patient was asked about his thinking abilities, he responded, "It's good. I don't really know."

**PSYCHOSOCIAL:** The patient reportedly was easygoing prior to his accident. His family have noted that he is currently easily overstimulated and irritable.

**ENDOCRINE:** The patient did have transient glucose intolerance during his hospitalization. However, according to his sister, with weight loss, he no longer requires any diabetic care or medication. She states that his weight prior to surgery was in the 200 pound plus range. She reports that he currently weighs 111 pounds.

## MEDICATIONS

1. Super-B complex with Vitamin C, one tablet daily.

2. Loratadine 10 mg daily for allergies.

3. Iron 325 mg twice daily.

8

4.   Vitamin E 400 IU once daily.

5.   Zoloft 150 mg once daily.

6.   Ativan 0.5 mg once daily with breakfast.  The patient's
     sister reports that she and her husband tried stopping the
     Ativan about a year and a half ago, but the patient became
     more agitated.

7.   Biaxin 1,000 mg daily for sinus infection for three weeks
     starting 10/03/05.  Previously, the patient had been on
     Amoxicillin in September for a couple of days, but this was
     stopped because the patient's sister was concerned about a
     family history of an allergy to penicillin.

When the patient was asked if he took any medications, he
responded, "Not that I can think of."


**ALLERGIES**

No known drug allergies are documented in the medical record.  The
patient's sister reports there is a strong family history of
penicillin allergy.


**FUNCTIONAL REVIEW OF SYSTEMS**

ACTIVITIES OF DAILY LIVING:  The patient is able to perform his
own grooming and hygiene.  He needs to be verbally prompted and
reminded to do so.  More than 50% of the time, it is "a battle" to
get him to wash up and brush his teeth.  He is able to dress
himself when his family lays out his clean clothes.  They report
that they must put his dirty clothes out of sight in a hamper.
Otherwise, he will accidentally put on the dirty clothes.  He is
able to shower himself, though once again, he has to be prompted
to do so.  Prior to his brain injury, he was independent in all
basic self-care.  The patient is no longer able to cook or
participate in housework activities.  He goes shopping with his
family, but he is no longer capable of shopping independently.  He
can no longer handle his medications independently.  He is
incapable of handling money.  Prior to his brain injury, he was
fully competent in all aspects of money management.

MOBILITY:  Mr. Grate is currently independent in ambulation within
the home.  He uses a wheelchair for community events that might be
crowded or might require him to go some distance.  He is no longer
able to drive because of cognitive problems.  Prior to his brain
injury, he was independent in all aspects of mobility including
driving automobiles and trucks.

SWALLOW:  He currently is on no dietary restrictions in terms of

his swallow,

BOWEL AND BLADDER: As previously noted, the patient wears a diaper at night though not during the day. His diaper is generally always wet when he wakes up in the morning. He typically has fecal incontinence daily.

## PHYSICAL EXAMINATION

VITAL SIGNS: B/P: 110/70, P: 104 and regular, R: 18

HEAD: Normocephalic, atraumatic.

EYES: Conjunctivae clear. Pupils equally round and reactive to light. Extraocular movements intact.

EARS: No discharge.

MOUTH: Mucous membranes moist.

NECK: Supple, with no lymphadenopathy, thyromegaly or bruits.

LUNGS: Clear.

HEART: Normal sinus rhythm.

EXTREMITIES: No clubbing, cyanosis or edema. Negative Homans' signs. Muscle wasting.

NEUROLOGIC:

MENTAL STATUS: The patient was an alert gentleman who was cooperative for the assessment. When asked the year, he initially responded, "I don't know." When pushed, he indicated that the year was "2000." When asked the month, he responded that it was the "end of summer." He thought the current president was "Ronald Reagan." When asked in what town he currently lives, he responded, incorrectly, "Eureka." He was later able to spontaneously recall that he lives with his sister and brother-in-law. He was correct in responding that he no longer works. However, his sister reported that he frequently forgets that he doesn't have to leave the house to go to work. His speech was dysarthric with about 85% intelligibility in a known context. He was able to tell me that an apple and an orange were both "fruit." He had difficulty abstracting the similarity between a novel and a poem, responding, "I don't read that much, so I don't know." He indicated that a bookcase and a desk were both "office equipment." He was able to repeat seven digits forwards and three digits backwards. He was unable to spell "world" forwards or backwards. He was able to spell his last name aloud correctly. He was unable to spell his last name backwards. He was given three unrelated words to recall. He recited all three correctly immediately.

10

However, three minutes after presentation, he could not recall a single word. When given clues, he could still not recall a single word. He did recognize two out of the three words when they were presented in a field of three. He was unable to remember having anything to eat prior to my examination. He was able to complete the sequence 1-A-2-"B".

When asked what he would do if he smelled smoke in the house, he responded "find out where it is coming from." When pushed and asked if he would do anything else, he responded, "What kind of fire?" I told him there was a grease fire on his stove. He responded, "Turn off the stove." I told him the fire was still burning and asked what he would do, and he responded, "Put it out." He knew that he should not use water. When told that the fire had spread to engulf the kitchen in flames, he stated that he would call the fire department.

The patient was asked to draw a clock. He neglected to drawn any kind of enclosure or circle for the clock. He had some distortion with number placement and, in fact, had a number 0 on his clock between 12 and 1. After he drew the clock, he had some difficulty telling the time.

CRANIAL NERVES

I: The patient was unable to identify any scents though he was very congested with a runny nose and he exhibited mouth breathing throughout the assessment.

II: Visual fields were full. Visual acuity for standard size print while wearing his glasses was fair. He was able to read, though he did make some errors.

III, IV, and VI: Intact.

V: Intact.

VII: Face symmetrical.

VIII: Decreased hearing to finger rub bilaterally.

IX, X: Intact.

XI: Intact.

XII: Tongue protrudes to the midline.

MOTOR: Tone was very subtly increased in all four extremities but essentially normal. Strength was good across all joints bilaterally.

Finger-to-nose testing of coordination was performed slowly but accurately.

11

Ambulation was performed with no loss of balance.  The patient
ambulated slowly, keeping his hands in his pockets.

Attempts at tandem walking were punctuated by loss of balance
requiring my assistance.

SENSATION:  Sharp/dull discrimination was intact and equal
bilaterally.  Proprioception was 100% intact at both thumbs.  It
was 100% intact at the right great toe but only 50% intact at the
left great toe.  This examiner questions whether or not this was a
fatigue effect.

DEEP TENDON REFLEXES:  Reflexes were 2+ and equal bilaterally.

BABINSKI RESPONSE:  Mr. Grate demonstrated withdrawal bilaterally.

**IMPRESSION**

1.   Mr. Rickie Grate is a 58-year-old, right-handed gentleman who
     suffered a hypoxic ischemic brain injury secondary to
     cardiorespiratory arrest in the immediate postoperative
     period following aortobifemoral bypass graft surgery on
     10/26/01.

2.   Anoxic encephalopathy secondary to #1 with impaired short-
     term memory, reasoning, safety awareness and judgment.

3.   Reduced balance secondary to #1.

4.   Disinhibited bowel and bladder with incontinence.

5.   Dysarthria secondary to #1 with about 85% speech
     intelligibility in a known context.

6.   Reduced sense of smell and taste, probably related to
     underlying sinus congestion.  This is not disability related.

7.   Coronary artery disease, status post three-vessel coronary
     artery bypass graft surgery February 1999 with relatively
     normal ejection fraction per follow-up testing in 1999.

8.   Hypertension, well controlled.

9.   History of hyperlipidemia.

10.  History of transient glucose intolerance, reportedly
     resolved.

11.  Tobacco dependence.

12.  Reduced frustration tolerance/irritability secondary to #1.

12

## DISCUSSION

Mr. Grate has been left with severe residual cognitive deficits as a result of the hypoxic ischemic brain injury he sustained on 10/26/01. He requires 24 hour per day supervision. This supervision is not currently wakeful at night. It is certainly possible that the care need not be wakeful during the night in the future, if indeed the patient adjusts to being under the care and supervision of someone other than his sister and brother-in-law. This remains to be seen. The patient is generally found with a wet diaper in the morning when he wakes up.

Mr. Grate lives with his sister, Sandra Tucker, and her husband, Jay Tucker. Sandra Tucker is confined to a wheelchair. She is co-conservator with Marsha Latner, the patient's other sister. Marsha Latner is currently disabled secondary to a stroke.

In a separate report entitled Recommendations for Life Care Planning, I will outline the patient's probable future medical needs and life expectancy.

DEBORAH DOHERTY, M.D.

DD:ms29

13

GC-340

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address):
Jerrald K. Pickering SBN 28189
PICKERING LAW CORPORATION
P.O. Box 992200
Redding, CA 96099-2200

TELEPHONE NO.: (530) 241-5811    FAX NO. (Optional):
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name): SANDRA B. TUCKER & MARSHA D. LATNER

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Shasta
STREET ADDRESS: 1500 Court Street
MAILING ADDRESS:
CITY AND ZIP CODE: Redding, CA 96001
BRANCH NAME:

CONSERVATORSHIP OF THE    [X] PERSON [X] ESTATE OF (Name):
RICKIE J. GRATE,
                                        CONSERVATEE

ORDER APPOINTING PROBATE CONSERVATOR
☐ Limited Conservatorship

FOR COURT USE ONLY

# FILED

APR 2 5 2002

CLERK OF THE SUPERIOR COURT
BY: D. WASSON, DEPUTY CLERK

CASE NUMBER:
23149

## WARNING: THIS APPOINTMENT IS NOT EFFECTIVE UNTIL LETTERS HAVE ISSUED.

1. The petition for appointment of conservator came on for hearing as follows (check boxes c, d, e, and f to indicate personal presence):
   a. Judge (name): ~~GREGORY M. CASKEY~~ JACK HALPIN
   b. Hearing date: APRIL 25, 2002    Time: 3:30 p.m.    [X] Dept.: 0    ☐ Room:
   c. [X] Petitioner (name): SANDRA B. TUCKER and MARSHA D. LATNER
   d. [X] Attorney for petitioner (name): Jerrald K. Pickering SBN 28189
   e. ☐ Attorney for person cited (name, address, and telephone):

   f. Person cited was  ☐ present  [X] unable to attend  ☐ able but unwilling to attend  ☐ out of state

THE COURT FINDS
2. All notices required by law have been given.
3. (Name): RICKIE J. GRATE
   a. [X] is unable properly to provide for his or her personal needs for physical health, food, clothing, or shelter.
   b. [X] is substantially unable to manage his or her financial resources or to resist fraud or undue influence
   c. ☐ has voluntarily requested appointment of a conservator and good cause has been shown for the appointment.
4. Conservatee
   a. [X] is an adult.
   b. ☐ will be an adult on the effective date of this order.
   c. ☐ is a married minor.
   d. ☐ is a minor whose marriage has been dissolved.
5. [X] There is no form of medical treatment for which the conservatee has the capacity to give an informed consent.
   ☐ Conservatee is an adherent of a religion defined in Probate Code section 2355(b).
6. [X] Granting the conservator powers to be exercised independently under Probate Code section 2590 is to the advantage and benefit and in the best interest of the conservatorship estate.
7. [X] Conservatee is not capable of completing an affidavit of voter registration.
8. ☐ Conservatee has dementia as defined in Probate Code section 2356.5, and the court finds all other facts required to make the orders specified in item 25.
9. ☐ Attorney (name)
   counsel to represent the conservatee in these proceedings. The cost for representation is: $                    has been appointed by the court as legal
   The conservatee has the ability to pay  ☐ all  ☐ none  ☐ a portion of this sum (specify): $
10. [X] Conservatee need not attend the hearing.
11. [X] The appointed court investigator is (name, address, and telephone): JACK VRISMO, 1640 WEST STREET, REDDING, CA 96001; (530) 225-5707
12. ☐ (For limited conservatorship only) The limited conservatee is developmentally disabled as defined in Probate Code section 1420.

Do NOT use this form for a temporary conservatorship.

Form Adopted for Mandatory Use
Judicial Council of California
GC-340 [Rev. January 1, 2002]

## ORDER APPOINTING PROBATE CONSERVATOR
(Probate Conservatorship)


Legal
Solutions
Plus

Page 1 of 3
Probate Code, § 1830

| CONSERVATORSHIP OF (Name): RICKIE J. GRATE, | CASE NUMBER: |
|---|---|
| CONSERVATEE | 23149 |

26. [X] Other orders as specified in Attachment 26 are granted.

27. [X] The probate referee appointed is (name and address): JACK VRISMO, 1640 West Street, Redding, CA 96001.

28. [ ] (For limited conservatorship only) Orders relating to the powers and duties of the limited conservator of the person under Probate Code section 2351.5 as specified in Attachment 28 are granted.

29. [ ] (For limited conservatorship only) Orders relating to the powers and duties of the limited conservator of the estate under Probate Code section 1830(b) as specified in Attachment 29 are granted.

30. [ ] (For limited conservatorship only) Orders limiting the civil and legal rights of the limited conservatee as specified in Attachment 30 are granted.

31. [X] This order is effective on the [X] date signed [ ] date minor attains majority (specify):

32. Number of boxes checked in items 15-31: 12

33. Number of pages attached: 1

Date: April 25, 2002

JACK HALPIN

JUDGE OF THE SUPERIOR COURT

[ ] SIGNATURE FOLLOWS LAST ATTACHMENT

GC-340 [Rev. January 1, 2002]

**ORDER APPOINTING PROBATE CONSERVATOR**
(Probate Conservatorship)

Page 3 of 3

The following powers be granted the conservator per Probate Code Sections 2590-2591;

    (a)     The power to contract for the conservatorship and to perform outstanding contracts and thereby bind the estate.

    (d)     The power to sell at public or private sale real or personal property of the estate.

    (e)     The power to create by grant or otherwise easements and servitudes.

    (f)     The power to borrow money and give security for the repayment thereof.

    (g)     The power to purchase real or personal property.

    (h)     The power to alter, improve, and repair or raze, replace, and rebuild property of the estate.

    (i)     The power to let or lease property of the estate for any purpose (including exploration for and removal of gas, oil, and other minerals and natural resources) and for any period, including a term commencing at a future time.

    (k)     The power to exchange property of the estate.

    (l)     The power to sell property of the estate on credit if any unpaid portion of the selling price is adequately secured.

    (m)     The power to commence and maintain an action for partition.

    (n)     The power to exercise stock rights and stock options.

    (p)     The power to pay, collect, compromise, arbitrate, or otherwise adjust claims, debts, or demands upon the conservatorship.

    (q)     The power to employ attorneys, accountants, investment counsel, agents, depositaries, and employees and to pay the expense.

# ATTACHMENT 21

RE:   **Conservatorship of Rickie J. Grate**
      Shasta County No: 23149

## ATTACHMENTS TO ORDER APPOINTING CO-CONSERVATORS

### ATTACHMENT 23

**The following powers be granted the conservator per Probate Code Sections 2351-2358:**

(1).   The conservator may fix the residence of the ward any place within this state without the permission of the court;

(2)    The conservator shall have the right under Probate Code Section 2355, the exclusive authority to give consent for such medical treatment to be performed on the conservatee as the conservator in good faith based on medical advice determines to be necessary and the conservator may require the conservatee to receive such medical treatment, whether or not the conservatee objects;

(3).   Pursuant to Probate Code Section 2354, the conservator may require the conservatee to receive medical treatment, whether or not the conservatee consents to such treatment, if a court order specifically authorizing such medical treatment has been obtained pursuant to Section 2357. The conservator may consent to medical treatment to be performed upon the conservatee, and may require the conservatee to receive such medical treatment, in any case where the conservator determines in good faith based upon medical advice that the case is an emergency case in which the medical treatment is require d because (1) such treatment is required for the alleviation of severe pain or is required for the alleviation of severe pain or (2) the conservatee has a medical condition which, if not immediately diagnosed and treated, will lead to serious disability or death. In such a case, the consent of the conservator alone is sufficient, and no person is liable because the medical treatment is performed upon the conservatee without the conservatee's consent.

### ATTACHMENT 26

Other orders are granted as specified below:

**Accountings:**   Shall be waived for as long as the estate continues to meet the requirements under Probate Code Section 2628(b).

RE:    Conservatorship of Rickie J. Grate

The property where the Proposed Conservatee keeps his equipment is a lot rented from the City of Arcata. The City of Arcata has given notice to vacate the premises for non-payment of rent. Co Conservators request permission to move Proposed Conservatee's motor home that was his residence and further request permission to remove, sell, or place into a rental unit, all of the proposed Co-Conservatee's equipment presently stored on the property without protective cover, exposed to weather. All are deteriorating. In addition, they are not insured. They are in an open, unlocked area, subject to vandalism and/or theft.

# ATTACHMENT 3d

§ 2591. Powers that may be granted

The powers referred to in Section 2590 are:

(a) The power to contract for the guardianship or conservatorship and to perform outstanding contracts and thereby bind the estate.

(b) The power to operate at the risk of the estate a business, farm, or enterprise constituting an asset of the estate.

(c) The power to grant and take options.

(d) The power to sell at public or private sale real or personal property of the estate.

(e) The power to create by grant or otherwise easements and servitudes.

(f) The power to borrow money and give security for the repayment thereof.

(g) The power to purchase real or personal property.

(h) The power to alter, improve, and repair or raze, replace, and rebuild property of the estate.

(i) The power to let or lease property of the estate for any purpose (including exploration for and removal of gas, oil, and other minerals and natural resources) and for any period, including a term commencing at a future time.

(j) The power to lend money on adequate security.

(k) The power to exchange property of the estate.

(l) The power to sell property of the estate on credit if any unpaid portion of the selling price is adequately secured.

(m) The power to commence and maintain an action for partition.

(n) The power to exercise stock rights and stock options.

(o) The power to participate in and become subject to and to consent to the provisions of a voting trust and of a reorganization, consolidation, merger, dissolution, liquidation, or other modification or adjustment affecting estate property.

(p) The power to pay, collect, compromise, arbitrate, or otherwise adjust claims, debts, or demands upon the guardianship or conservatorship.

(q) The power to employ attorneys, accountants, investment counsel, agents, depositaries, and employees and to pay the expense. (Stats.1990, c. 79 (A.B.759), § 14, operative July 1, 1991.)

Cross References
Easements and servitudes, see Civil Code § 801 et seq.

§ 2592. Independent exercise of powers; order granting authority

The court may, in its discretion, make an order granting the powers or conservator any one or more or all of the powers specified in Section 2591 if the court determines that, under the circumstances of the particular guardianship or conservatorship, it would be to the advantage, benefit, and best interest of the estate to do so. Subject only to such requirements, conditions, or limitations as are specifically and expressly provided, either directly or by reference, in the order granting the power or powers, the guardian or conservator may exercise the granted power or powers without court supervision, instructions, approval, or confirmation in the same manner as the ward or conservatee could do if possessed of legal capacity. (Stats.1990, c. 79 (A.B.759), § 14, operative July 1, 1991.)

138

# ATTACHMENT 3d

COPY

GC-350

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address):
Jerrald K. Pickering SBN 28189
PICKERING LAW CORPORATION
P.O. Box 992200
Redding, CA 96099-2200

TELEPHONE AND FAX NOS.: 530-241-5811

FOR RECORDER'S USE ONLY

ATTORNEY FOR (Name): Petitioner, SANDRA B. TUCKER and MARSHA LATNER

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Shasta
STREET ADDRESS: 1500 Court St.
MAILING ADDRESS:
CITY AND ZIP CODE: Redding, CA 96001
BRANCH NAME:

CONSERVATORSHIP OF (Name): RICKIE J. GRATE,

CONSERVATEE

LETTERS OF CONSERVATORSHIP
[X] Person   [X] Estate   [ ] Limited Conservatorship

CASE NUMBER:
23149
FOR COURT USE ONLY

FILED
APR 25 2002
CLERK OF THE SUPERIOR COURT
BY: D. WASSON, DEPUTY CLERK

1. [X] (Name): SANDRA B. TUCKER and MARSHA LATNER are the appointed
   [X] conservators [ ] limited conservator of the [X] person [X] estate
   of (name): RICKIE J. GRATE

2. [ ] (For conservatorship that was on December 31, 1980, a guardianship of an adult
   or of the person of a married minor) (name):
   was appointed the guardian of the [ ] person [ ] estate by order
   dated (specify):   and is now the conservator of
   the [ ] person [ ] estate of (name):

3. [X] Other powers have been granted or conditions imposed as follows:
   a. [X] Exclusive authority to give consent for and to require the conservatee to
      receive medical treatment that the conservator in good faith based on
      medical advice determines to be necessary even if the conservatee
      objects, subject to the limitations stated in Probate Code section 2356.
      (1) [ ] This treatment shall be performed by an accredited practitioner
          of the religion whose tenets and practices call for reliance on
          prayer alone for healing of which the conservatee was an adherent prior to the establishment of the
          conservatorship.
      (2) [ ] (If court order limits duration) This medical authority terminates on (date):
   b. [ ] Authority to place conservatee in a care or nursing facility described in Probate Code section 2356(b).
   c. [ ] Authority to authorize the administration of medications appropriate for the care and treatment of dementia described
      in Probate Code section 2356.5(c).
   d. [X] Powers to be exercised independently under Probate Code section 2590 as specified in Attachment 3d (specify
      powers, restriction, conditions, and limitations).
   e. [ ] Conditions relating to the care and custody of the property under Probate Code section 2402 as specified in Attach-
      ment 3e.
   f. [ ] Conditions relating to the care, treatment, education, and welfare of the conservatee under Probate Code section
      2358 as specified in Attachment 3f.
   g. [ ] (For limited conservatorship only) Powers of the limited conservator of the person under Probate Code section
      2351.5 as specified in Attachment 3g.
   h. [ ] (For limited conservatorship only) Powers of the limited conservator of the estate under Probate Code section
      1830(b) as specified in Attachment 3h.
   i. [ ] other (specify):

4. [ ] The conservator is not authorized to take possession of money or any other property without a
   specific court order.

5. Number of pages attached:

WITNESS, clerk of the court, with seal of the court affixed.

Date: 4-25-02

Clerk, by (signature) _____, Deputy

(Continued on reverse)

LETTERS OF CONSERVATORSHIP

Form Approved by the
Judicial Council of California
GC-350 (Rev. January 1, 1998)
Mandatory Use 1/1/2000

This form may be recorded as notice of the establishment of a conservatorship of the estate as provided in Probate Code section 1875.

Probate Code, § 1834

COPY

FEB 21 2002

Legal
Solutions
Plus

| CONSERVATORSHIP OF *(Name)*: RICKIE J. GRATE, | CASE NUMBER: |
|---|---|
| CONSERVATEE | |

## LETTERS OF CONSERVATORSHIP

### AFFIRMATION

I solemnly affirm that I will perform according to law the duties of   [X] conservator   [ ] limited conservator.

Executed on *(date)*:   **January 28, 2002** , at *(place)*: REDDING, CA

                 *Sandra B. Tucker*
                       (SIGNATURE OF APPOINTEE)
                   SANDRA B. TUCKER

Executed on      **February 4** , 2002 at EUREKA, CA.

                 *Marsha DeLatner*
                     MARSHA DeLATNER

### CERTIFICATION

I certify that this document and any attachments is a correct copy of the original on file in my office, and that the letters issued to the person appointed above have not been revoked, annulled, or set aside, and are still in full force and effect.

Date:   **MAY - 2 2002**

                     Clerk, by   *D Wasson* , Deputy

(SEAL)
REDDING BRANCH
SUPERIOR COURT
SHASTA COUNTY
CALIF.
SEAL

GC-350 [Rev. January 1, 1998]

LETTERS OF CONSERVATORSHIP                    Page two